Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement dated 9 April 1997, which are incorporated herein by reference, and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. At such time, an employment relationship existed between plaintiff and defendant.
3. Defendant is a qualified self-insured with ESIS, Inc. as its servicing agent.
4. Plaintiffs average weekly wage is $787.47, thus entitling plaintiff to the maximum compensation rate for 1994 of $466.00 per week.
 ***********
Based upon all of the competent, evidence adduced from the record, and the reasonable inferences therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. On or about 23 November 1994, plaintiff was employed by defendant as an Operator. At that time, plaintiff was working on a Design Team, which was performing a line conversion. Plaintiffs duties involved classroom work, as well as overtime work in the plant. Following her classroom work on 23 November 1994, plaintiff was operating her machine when she encountered a problem with her doff assist. The machine malfunctioned and plaintiff grabbed hold of the machine. The machine pulled plaintiff up with her arms over her head and stretched her to where she was up on her toes for a second or two. Plaintiff felt a burning sensation and pain in her lower back which lasted for a few seconds. Plaintiff did not report this incident to her supervisor or to the plant nurse on 23 November 1994.
2. After the incident, plaintiffs pain subsided and plaintiff was able to continue to work for the short time that remained in her shift.
3. The injury to plaintiffs back due to the sudden and unexpected stretching of her body when the doff assist malfunctioned constituted an injury by accident arising out of and in the course of the employment and was the direct result of a specific traumatic incident of the work assigned.
4. At the time of plaintiffs injury, her normal supervisor was not at the plant. At first, she did not consider the injury to be major, feeling that it would go away with time. When the injury did not resolve over the Thanksgiving holidays, plaintiff reported the injury to the plant nurse on 5 December 1994.
5. The injury described in the plant nurses records is consistent with plaintiffs testimony at the hearing before the Deputy Commissioner. After plaintiffs injury at work, she continued to have pain with other activities such as housework.
6. Following her injury, plaintiff sought treatment from her family physician, Dr. Roy Agner, who diagnosed her as having a thoracolumbar and lumbar strain. According to Dr. Angers notes on 9 December 1994, plaintiff reported to him that she had pulled her back at work while working overhead on a doff assist on 23 November 1994. Dr. Angers notes indicate and the Full Commission finds that plaintiff felt an acute burning pain in the upper lumbar area at the time of the incident but "pushed on. When the pain worsened, plaintiff reported the pain to defendant-employer.
7. Prior to the incident on 23 November 1994, plaintiff had some recurring headaches and had complaints of back pain in the lumbo-sacral area on 11 August 1987, and lateral neck and shoulder pain while participating in an upper body strengthening and conditioning program in February 1992. By 18 May 1992, plaintiff was "entirely asymptomatic from her musculoskeletal headaches secondary to cervicalgia according to Dr. James M. McCabe.
8. After her injury of 23 November 1994, plaintiff continued to work and participate in the Hoechst Celanese bowling league; however, she had increasing difficulties with activity. She had to pre-bowl games as she could not keep up with the other bowlers, and had to have other bowlers fill in for her on occasions when she was physically unable to bowl at all. She continued to work, going back onto the floor to doff about a month after the accident happened.
9. On 25 January 1995, plaintiff presented to Dr. Tony Hinson with a primary complaint of headaches which Dr. Hinson related to tension. Plaintiff returned for treatment on 1 March 1995 with continued complaints of headaches as well as tenderness in the back of her neck. These complaints continued through plaintiffs 28 March 1995 visit. At that time, Dr. Hinson noted that plaintiff had palpable muscle spasms in the trapezius area which Dr. Hinson noted was most likely caused by a traumatic injury in the nature of a sprain or strain. On 10 April 1995, plaintiff presented with back pain which Dr. Hinson believed was musculoskeletal in nature. Up to this point, Dr. Hinson had been treating plaintiff with a standard muscle relaxer. Because plaintiff was not improving, Dr. Hinson felt that her condition was beyond his scope of expertise, and referred her to an orthopedist, Dr. Thomas E. Sikes.
10. On 20 April 1995, plaintiff presented to Dr. Sikes with complaints of lower back and side pain, which she related to a work injury suffered on 23 November 1994. Dr. Sikes examined plaintiff and found that she had diffuse tenderness both in the low back and the mid to low back. He did not find any evidence of arthritic change in her back, compression fractures or any bone injury. Dr. Sikes diagnosed plaintiff with a lumbar strain and degenerative disc disease. Dr. Sikes opined that the strain was responsible for at least part of plaintiffs symptoms, although he found no evidence of harm or damage from plaintiffs strain accident and believed that she would recover from her symptoms in time. Dr. Sikes did not believe that plaintiff suffered from fibromyalgia as she did not have symptoms present "in scattered areas of the body. When asked whether plaintiff suffered from myofascial pain syndrome, Dr. Sikes stated that he was "not quite sure what that is.
11. Plaintiff continued to work her full shift until 30 May 1995. However, it was with pain, and it took all the endurance she had just to perform her job. On 30 May 1995, plaintiff left her job as she was unable to push the buggies carrying the cakes of yarn any longer.
12. Plaintiff returned to Dr. Hinson 31 May 1995, with continuing complaints of back pain and increased difficulty getting around. Dr. Hinsons examination revealed tenderness over the lumbar paraspinous muscles, which he believed was musculoskeletal in origin. He suggested massage therapy and stated that he wrote plaintiff out of work, although he was unable to find documentation of the exact dates during which he excused plaintiff from work.
13. When plaintiff returned to Dr. Hinson on 15 June 1995, he still believed that plaintiff should not return to work. Plaintiff still had a lot of muscle spasm in her lower back, which Dr. Hinson treated with muscle relaxers and physical therapy. During an examination on 25 July 1995, Dr. Hinson noted that plaintiff was still having muscle spasms, and that she had developed some trigger points which by touching caused inappropriate pain. Dr. Hinson believes he continued to keep plaintiff out of work.
14. On 25 August 1995, plaintiff approached Dr. Hinson about returning to work. He agreed that making such an attempt would be in her best interest, and recommended that she start with six hour shifts and increase to eight, with a lifting restriction of 20 pounds. Defendant-employer informed plaintiff that they had no jobs within her restrictions. On 6 September 1995 plaintiff called Dr. Hinson and requested an extension of her medical leave rather than returning to her old job duties which did not comply with her medical restrictions.
15. Plaintiff did attempt to return to work for defendant-employer on or about 9 September 1995; however, on 25 September 1995, Dr. Hinson received a call-in note from Jan Hatley, defendant-employers nurse, which indicated that plaintiff continued to have back pain on light duty jobs, that she was unable to work eight hours, and that Ms. Hatley felt plaintiff may require additional medical leave. Dr. Hinson scheduled another appointment with plaintiff and following that meeting, he recommended that plaintiff not return to work due to her back pain, and that she resume physical therapy.
16. Plaintiff was last treated by Dr. Hinson on 11 October 1995, at which time he continued to write plaintiff out of work for her back pain. Dr. Hinson stated that he uses the terms "myofascial pain and "musculoskeletal pain somewhat interchangeably, but believes that the use of the more general term of musculoskeletal pain is more accurate in plaintiffs case to describe her symptoms. He further stated that the cause of musculoskeletal pain was usually a strain or a sprain of the spine caused by a fracture or by degenerative arthritis, but noted that he had found no evidence of either in plaintiffs case. Lastly, Dr. Hinson stated that a stretching injury like that claimed by plaintiff could cause a muscle strain and could cause what he termed as musculoskeletal pain. When asked whether the injury plaintiff described could have caused the back pain for which he wrote plaintiff out of work, Dr. Hinson would only testify to it being "possible.
17. Following her treatment with Dr. Hinson, plaintiff received physical therapy from HealthSouth. On 4 January 1996, plaintiff presented to pain management expert Dr. Brian Wilder with Southeast Pain Care in Charlotte, North Carolina. Plaintiff complained of widespread, vague pain from her neck to her sacrum, as well as extremity pain, which she related to the 23 November 1994 incident at work. Plaintiff described her prior treatment, and told Dr. Wilder that her pain had changed very little as a result. Dr. Wilder diagnosed plaintiff with myofascial pain syndrome, which he explained as a more localized version of fibromyalgia nonarticular rheumatism. Dr. Wilder treated plaintiff with medication and trigger point injections, a TENS unit and physical therapy.
18. Dr. Wilder continued to treat plaintiff until mid June when plaintiff moved from the area. He did not offer an opinion as to plaintiffs ability to work as she had not reached a point of reasonable improvement during his treatment; however he did not at any point suggest that she return to work. Dr. Wilder noted that while a specific incident often starts myofascial pain, other factors such as emotional tension, stress, depression, or personality, may be involved in maintaining the condition. Accordingly, he relies upon the absence of pain prior to the specific event to establish causation as at least a contributing factor.
19. On 15 July 1996, plaintiff presented to pain management specialist Dr. Francisco Naveira, at the Bowman Gray Pain Clinic. Dr. Naveira is a member of the faculty at Bowman Gray, teaching pain management, and is board certified in both anesthesiology and pain management. At that time, her examination showed tenderness to palpation over the left cervical neck muscles as well as the lumbosacral area. Plaintiffs chief complaints were left neck pain with associated headaches and chronic low back pain. Dr. Naveira diagnosed probable myofascial pain syndrome. Again, at the initial meeting plaintiff related her condition to the work-related incident.
20. Dr. Naveira explained that myofascial pain syndrome was more localized than fibromyalgia, and that the terms were often mixed up by physicians who are not trained in the specialty of pain management. He further stated that plaintiffs condition is chronic. According to Dr. Naveira, plaintiffs condition will come and go, and she will have exacerbations of her neck and low back pain. He testified that plaintiff was beginning to get used to the idea that her condition was going to be permanent, and treatment with pain control medications will be ongoing.
21. Dr. Naveira stated that on average, myofascial pain is the result of an injury in which the muscles involved are stretched to the point where some of the fibers break, thereafter starting a cycle of pain. It is a common result of muscle stretching injuries, but can occur with repetitive muscle injuries as well.
22. Plaintiff underwent a Functional Capacity Evaluation (FCE) on 20 January 1996. According to the results of the exam, plaintiffs acceptable leg lift capacity is 10 pounds, as is her torso lift capacity. The FCE results further indicated that plaintiff could work at a sedentary level for an eight-hour day. Based upon the FCE, Dr. Naveira opined that plaintiff could not return to work at her former job.
23. Dr. Naveiras records indicate that on 24 October 1997 plaintiff stated that she had attempted to attend classes for the purpose of retraining; however, her symptoms increased and she experienced some mental confusion and difficulty staying alert. Dr. Naveira opined that plaintiffs difficulty returning to school and performing in that sedentary environment might be indicative of an inability of plaintiff to perform in a sedentary work environment.
24. Dr. Naveira was of the opinion that plaintiffs myofascial pain syndrome was, more likely than not, caused by her injury of 23 November 1994, at Hoechst Celanese, but some of her headache component and some of her neck pain could predate her injury. However, plaintiffs stretching type injury could have aggravated her pre-existing headache problems. In response to whether depression played any role in the development of employee-plaintiffs pain syndrome, Dr. Naveira was of the opinion that more commonly, the depressive component usually comes after the pain.
25. Although plaintiff did not tell Dr. Naveira about the medical treatment she had received from Dr. Agner, Dr. Sikes or Dr. Hinson, Dr. Naveira was presented hypothetical questions during his deposition which adequately described plaintiffs medical history and he still opined that plaintiffs work-related injury either caused or aggravated her neck and back pain and could have worsened her headaches. The Full Commission accords greater weight to the opinion of Dr. Naveira over the opinions of other physicians in this case.
26. On 12 March 1997, plaintiff was released from the care of the Bowman Gray Pain Clinic by Dr. Kevin Speight. Dr. Naveira was of the opinion that while plaintiff will require follow-up care, from this point on, her treatment will consist primarily of "maintenance treatment for continuing pain. From a standpoint of improvement, he stated that he "guess[ed] we have reached maximum medical improvement.
27. Based upon the greater weight of the evidence, the Full Commission finds that plaintiffs neck and back pain (myofascial pain syndrome) was either caused by or significantly aggravated by her work-related injury of 23 November 1994. Plaintiffs stretching injury also caused a worsening of her headaches. As a result of her injury, plaintiff was temporarily totally disabled from 31 May 1995 through 8 September 1995, and from 25 September 1995 through 12 March 1997 when she reached maximum medical improvement. Plaintiffs unsuccessful attempt to return to work does not operate to rebut her prior showing of total disability. Since reaching maximum medical improvement, plaintiff has continued to be totally disabled.
28. Plaintiff was paid $9,755.20 in short-term disability benefits from a plan that was fully funded by defendant-employer.
29. Plaintiff was paid $65,143.19 in long-term disability benefits from a plan that plaintiff contributed to through a Flex Benefit Program. Amounts contributed to the Flex Benefit Program comes from salary to an employee and once they go into a Flex Benefit Program that amount becomes non-taxable as to the employee. The deduction from salary was listed along with other deductions from plaintiffs gross salary, which includes the seven-tenths percent (0.7%) going to the Flex Benefits Program.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury to her back which arose out of and in the course of her employment with defendant-employer on 23 November 1994, and was the direct result of a specific traumatic incident of the work assigned. In addition, as a result of her stretching-type work-related injury, plaintiff developed myofascial pain syndrome affecting her neck and back and her pre-existing headache problems worsened. N.C. Gen. Stat. 97-2(6).
2. As a result of the compensable injury, plaintiff is entitled to temporary total disability compensation at the rate of $466.00 per week beginning 31 May 1995 through 8 September 1995, and beginning again on 25 September 1995 and continuing until 12 March 1997 when she reached maximum medical improvement. Since reaching maximum medical improvement, plaintiff has remained totally disabled, and so is entitled to continuing total disability compensation until she returns to work or until further order of the Commission. N.C. Gen. Stat. 97-29.
3. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred in the future as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. 97-2(19).
4. Plaintiff-employee is entitled to have defendants provide vocational rehabilitation services. N.C. Gen. Stat. 97-25.
5. Defendants are entitled to a credit for short-term disability payments made to plaintiff in the amount of $9,755.20. However, defendants are not entitled to a credit for the long-term disability payments as defendant did not prove it made all the contributions to the plan. N.C. Gen. Stat. 97-42.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorneys fee herein approved, defendants shall pay temporary total disability compensation to plaintiff at the rate of $466.00 per week for the period from 31 May 1995 through 8 September 1995, from 25 September 1995 until 12 March 1997, and from 13 March 1997 until plaintiff returns to work or until further order of the Commission. As much of said compensation as has accrued shall be paid in a lump sum. Defendants, however, are entitled to a credit for short-term disability payments made to plaintiff in the amount of $9,755.20.
2. A reasonable attorneys fee of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiffs counsel as follows: 25% of any accrued compensation due plaintiff shall be deducted and paid directly plaintiffs counsel; thereafter, plaintiffs counsel shall receive every fourth check.
3. Defendants shall pay medical expenses incurred or to be incurred when bills for the same have been approved, in accordance with the provisions of the Act.
4. Defendants shall pay the costs.
This the ___ day of June, 2001.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER